LINDSLEY, Respondent, vs. FARMERS EXCHANGE INVESTMENT COMPANY and others, Defendants: MICKSCH and another, Appellants.

*November 10, 1936—February 9, 1937.*

For the appellant Wisconsin State Bank there were briefs by *North, Bie, Duquaine, Welsh & Trowbridge,* and oral argument by *Alex Wilmer,* all of Green Bay.

For the appellant J. V. Micksch there was a brief by *McCormick & Thiele* of Green Bay, and oral argument by *Arthur A. Thiele.*

For the respondent there was a brief by *Reynolds & Reynolds* and *J. Robert Kaftan,* all of Green Bay, and oral argument by *Mr. John W. Reynolds* and *Mr. Kaftan.*

MARTIN, J. The trial court found: That on March 9, 1921, the Farmers Exchange Bank and its directors caused to be incorporated under the laws of Wisconsin, the Farmers Exchange Investment Company for the sole and specific purpose of acquiring a site for a new bank building, to finance it by a bond issue, and turn the equity over to the bank, which transaction was completed on or before December 11, 1924; that upon completion of this transaction, the Investment Company was without assets and was *functus officio* so far as the original purpose was concerned. That the authorized capital of the Investment Company was $10,000, consisting of one hundred nonassessable shares of the face or par value of $100, all of which was subscribed for by stockholders and officers of the bank, and $4,900 was paid in on the subscriptions.

That during the period from the completion of the new bank building until the bank closed on August 15, 1932, the bank continually had on hand in the operation of its business large amounts of slow or worthless paper which it became necessary for it to dispose of. During this period the bank used the Investment Company as an instrumentality to get rid of its slow or worthless paper for cash. The bank followed the practice of transferring to the Investment Company such of its assets as the banking commissioner objected to being carried longer as assets. They were usually transferred to the Investment Company at face value.

That the method of financing the Investment Company so that it could take over·this slow·and worthless paper ·was .by

the sale of so-called "interim certificates" issued by the Investment Company at the counters of the bank, by bank officials to the bank's customers. The Investment Company undertook to invest for the purchasers of the interim certificates the amounts paid therefor in good and valuable securities in accordance with the terms of the certificates. The money so received from the sale of the certificates was used by the bank to take the place of its slow or worthless paper. That in addition thereto, other money was received and used for the same purpose by borrowing money from banking institutions on the notes of said Investment Company indorsed by the directors of the bank.

That when the bank began to use the Investment Company as its instrumentality to get rid of its slow paper, the directors of the bank raised the salary of its president from $1,200 to $4,800 a year with the agreement and understanding with him that he would use the increase in his salary to retire the principal and interest on the obligations incurred for money obtained to take care of such slow and worthless paper; that the salaries of other officers of the bank were substantially increased under similar agreements with the officers, and the increase in such salaries was so applied until the bank closed in August, 1932.

That on January 3, 1930, all of the directors of the bank made, executed, and filed with the Investment Company an unconditional guaranty of payment of all sums which the Investment Company might borrow up to $22,000. It was a continuing guaranty and was signed by all of the individual defendants in this action.

That on January 1, 1931, the charter of the Investment Company was revoked, canceled, and forfeited by the state of Wisconsin, and it ceased to exist as a corporation, and at the time plaintiff parted with his money and received the "interim certificate," the Investment Company was no longer in existence as a corporation or as a legal entity.

That on January 7, 1932, plaintiff, who was a regular customer of the bank, had on deposit there $1,500, and applied to the cashier to invest it in safe security or securities. Thereupon, the bank, through A. L. Cannard, its cashier, sold and delivered to the plaintiff a so-called "interim certificate" reading as follows:

"INTERIM CERTIFICATE
"Issued by
"FARMERS EXCHANGE INVESTMENT CO.
"Office
"Farmers Exchange Bank,
"Green Bay, Wisconsin.

"*$1,500.00* Par Value.                     Certificate No. *72.*
"Upon the surrender of this certificate properly indorsed, we, the undersigned, will deliver to *August Lindsley* or order, *Fifteen Hundred* Dollars par value of *To be invested for him to net 6% interest and to be called at his request his request within ninety day periods if desired by giving 90 days notices of his intention of wanting the funds represented by this certificate.*
"Maturing, *Ninety day demand.*
"With all interest coupons unmatured at this date attached; said delivery by us to be made only when, if and as said securities are issued and received by us; as soon as said securities have been received and are ready for delivery by us notice thereof will be mailed to the above named holder at his last address registered by us.
"Dated *January 7, 1932.*
"FARMERS EXCHANGE INVESTMENT CO.
"1500 Dol's                     00 Cts.
"A. L. CANNARD Secretary."
(Italicized portions were typewritten.)

That at the time of the sale of the "interim certificate" to the plaintiff, as an inducement to him to purchase it, Mr. Cannard told him that the bank and its directors were behind it. "That the said A. L. Cannard, cashier, told the truth that the bank and the directors were behind the certificate and con-

tinued to be behind these certificates and are behind it now." That the plaintiff knew nothing of said so-called Investment Company and relied entirely upon said bank and the statement so made in parting with his money. That the Investment Company did not comply with any of the statutory requirements so as to authorize it to do an investment business in Wisconsin.

The finding that because of the forfeiture of its charter on January 1, 1931, for failure to comply with sec. 180.08 (2), Stats., the Investment Company was no longer in existence as a corporation or as a legal entity, is more in the nature of a legal conclusion than a finding of fact. This finding is not sustained by the evidence. The Investment Company filed reports, as required, in the office of the secretary of state for the years 1922 to 1926, inclusive, showing that it was engaged in business during those years. It also filed reports in 1927, 1928, and 1929, showing that the corporation was not engaged in active business during those years. No reports have been filed since 1929, and no steps have been taken to have the forfeiture rescinded. The failure of a corporation to file its annual report, as required by sec. 180.08 (2), Stats., does not work a forfeiture of corporate rights and privileges *ipso facto*. *West Park Realty Co. v. Porth,* 192 Wis. 307, 212 N. W. 651, and cases cited.

It is contended that the court erred in amending the complaint to conform to the proof made and in awarding judgment as upon contract. The complaint stated the facts on which plaintiff sought a recovery. All of the material evidence·in proof of the ultimate facts alleged was received without objection. At the conclusion of the evidence, the trial court said:

"There is no occasion to amend the pleadings here. The proof has amended the pleadings. There is no claim of being misled. There is no opportunity to make such claim. The

facts are all here that can be proved, so far as I can see; and if it turns out in the end that this action is founded upon contract, the fact that it was started, founded upon tort, is quite an immaterial consideration at the present time. The damages, of course, are proved. Lindsley paid in $1,500. He never got it back. . . . So I cannot escape the conclusion that the bank and the several directors who are made defendants here, are, upon the undisputed facts, all liable."

The trial court's decision was announced on February 12, 1936. The findings, conclusions of law, and judgment were entered on March 25th, following. There was no request in the meantime on behalf of any of the defendants to offer further evidence. This is not a case of failure of proof as contemplated by sec. 263.31, Stats. A similar situation was presented in *Mahonna v. Chaimson,* 214 Wis. 396, 253 N. W. 391. That action was brought in tort and, as in the instant case, the trial court held that the pleading should be deemed to be amended in accordance with the evidence, and recovery on contract was awarded. Upon motion to review, this court affirmed the action of the trial court in awarding damages on contract.

As to the appellant Micksch, he is liable upon the written guaranty signed by himself and the other individual defendants who have not appealed from the judgment. As to the appellant bank, we have a more involved situation. However, an unbroken chain of facts and circumstances leads unmistakably to its liability. After a careful study of the evidence, the greater part of which as to the material facts is not in dispute, we adopt, with full approval, the following from the opinion of the learned trial judge:

"This investment company was originally organized for a particular purpose,—that was, to take over this lot where the bank building was built, build the building, bond it, sell the bonds and turn the equity over to the bank. It did all of those things. It was *functus officio* so far as the original purpose

was concerned. It is true that in its articles it had other purposes stated, but those are merely a kind of blanket statement and it went far beyond the original idea of its organizers. The concern was then, as I view it, finished in its work. It was without assets and without business for a period. Now, from that time on, it seems to me that the use that was made of that investment company was a use that the bank made of it. The hand was the hand of Esau, but the voice was the voice of Jacob. . . . It was not an independent institution. It was run by the directors of the bank and the officers of the bank for the purpose of saving the bank. And it seems to me, from that time on to the end of its life,—and it was dead before this loan was made by Lindsley, it was neither more or less than an arm of the bank, and its transactions bound the bank, and when that money was deposited by Lindsley he supposed he was depositing it with the bank's officers.

"He was informed, as he testified, and as Mr. Cannard has testified, that the bank and the directors of the bank were behind that certificate that he received. There is no dispute about the facts as to what was represented to him. Neither is there any dispute, in my mind, about what the facts actually were. The bank was behind it. The directors were behind it. They had signed a guaranty. Mr. Cannard did not tell any untruth about it. There was no misrepresentation. It was a statement of the facts, the truth, that the bank and the directors were behind that certificate. I think the bank and the directors from that time on continued behind that certificate and are behind it today. That is my view of the situation."

It will serve no useful purpose to analyze the evidence in its relation to the several findings of fact set out in the fore part of this opinion. There is a specific finding that the bank for a considerable period used the Investment Company as an instrumentality to get rid of its slow or worthless paper. The so-called "interim certificate" was used as a device to get money from investors for that purpose. In addition to the proceeds of the sale of interim certificates, the Investment Company on its note indorsed by its directors, who are also

directors of the bank, borrowed substantial sums from banking institutions, using the proceeds to take over from the bank a large amount of its worthless or questionable assets. The bank received, directly and indirectly, the $1,500 invested by the plaintiff in the so-called "interim certificate."

At all times in question the officials of the bank were also the officials of the Investment Company. The business affairs of the Investment Company were usually discussed informally at the meetings of the directors of the bank. Its business was conducted in the main offices of the bank and by individuals who were officers of both. No salaries were paid to the officers of the Investment Company and no dividends were declared on its capital stock.

The interim certificate set out above was the form prepared for use when the Investment Company was originally organized to be issued to those subscribing for bonds to be issued against the new bank building and property, that is, the interim certificates were issued to the purchasers of such bonds to be held by them until such time as the bonds were issued and ready for delivery, whereupon they would be taken up and the bonds delivered to the customer. When the bank became involved in financial difficulties, the interim certificate was resorted to and issued to those customers of the bank seeking investments, and there were inserted in the body of the certificate the terms of whatever agreement might be made with the investor. All of the directors and officers of both the bank and the Investment Company knew that the interim certificates were being issued to customers of the bank who were seeking investments. They all knew that the proceeds derived from the sale of the certificates were used to take out of the bank its slow or worthless assets.

The bank now contends that the entire course of dealing was *ultra vires* and, further, that the bank cannot be held liable on any theory of unjust enrichment because it did not

benefit by the dealings of the investment. In *Hunter v. Barronett State Bank,* 203 Wis. 576, 577, 234 N. W. 746, the court said:

"The bank defends on the ground that it did not authorize the guaranty and that it is *ultra vires* and void. While the act of the cashier in placing the guaranty on the back of the note was not authorized by any vote or act of the stockholders or directors of the bank, the cashier was the active managing officer of the bank, the indorsement was made for the benefit of the bank, and the bank was benefited by the guaranty, as will be shown. These facts were found by the trial court upon sufficient evidence and, under the circumstances, the bank cannot avoid payment on the ground that the cashier was not authorized to place the guaranty of the bank on the back of the note."

In *American Express Co. v. Citizens State Bank,* 181 Wis. 172, 194 N. W. 427, this court had occasion to review the doctrine of *ultra vires.* While in that case, under the facts established, it was held that the bank had the right to defend on the ground of *ultra vires,* the court said:

"It will be found, however, on examination of the Wisconsin cases on this subject that in nearly every case, if not in every case, there was some element of benefit to the corporation urging the defense, and the same will be found to be true in the large number of cases which might be cited from other jurisdictions in which the defense of *ultra vires* has been denied and in some of which very broad general language is used which might be quoted as tending to show that there is no such defense as *ultra vires.* It is so well settled that in general a corporation cannot commit the rank injustice of enriching itself by retaining the fruits of a contract and then repudiate it that it is hardly necessary to cite authorities on the subject."

In *First Trust Co. v. Miller,* 160 Wis. 336, 338, 151 N. W. 813, the court said:

"Technically speaking, a corporation cannot act contractually, except by its board of directors, or their authority;

but that has so many exceptions as to be of little use in practical affairs. A corporation may be bound by its custom of doing business. It may be bound by acquiescence; *it may be bound by accepting and retaining the fruits of a transaction and in other ways* without any action by its board of directors."

In view of the foregoing decisions, and it appearing from the facts that the bank received the money of the plaintiff and that it secured these funds by using the interim certificate of the Investment Company as an evidence of indebtedness, the bank is liable for the amount so received. Whether this be treated as a contract *ultra vires* in character, as to which the bank is estopped to set up the defense of want of power, or whether, as seems more likely, the liability is based on restitutionary principles founded on the fact that the bank, by reason of the means in which it got possession of the funds, is presently unjustly enriched at the expense of the plaintiff and ought in equity and good conscience to restore him to his former position makes no difference as the extent of recovery is the same.

*By the Court.*—Judgment affirmed.